# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| United States of America<br><br>v.<br><br>LOURDES NAVARRO,<br><br>Defendant(s) | Case No.   2:22-mj-01424-DUTY |

**LODGED**
CLERK, U.S. DISTRICT COURT
4/7/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: ___vam___ DEPUTY

**FILED**
CLERK, U.S. DISTRICT COURT
4/7/22
CENTRAL DISTRICT OF CALIFORNIA
BY: ___slo___ DEPUTY

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of November 6, 2018 in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1001 | False Statements and Concealed Material Facts |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
_____
Complainant's signature

Elaine Wong, FBI Special Agent
_____
Printed name and title

Sworn to before me and signed in my presence.

Date: 4/7/22

John E. McDermott (signature)
_____
Judge's signature

City and state: Los Angeles, California

Hon. John E. McDermott, U.S. Magistrate Judge
_____
Printed name and title

**AFFIDAVIT**

I, Elaine Wong, being duly sworn, declare and state:

## I.     INTRODUCTION

1.    I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since February 2013. I am currently assigned to a White Collar Crimes Squad, Los Angeles Field Office, West Covina Resident Agency, where I am responsible for investigating complex financial crimes, including health care fraud.  My position has vested me with the authority to investigate violations of Federal criminal law, to include, but not limited to, health care fraud.  Since becoming an FBI Special Agent, I received 22 weeks of formal training at the FBI Training Academy in Quantico, Virginia, as well as additional training courses related to criminal and counterintelligence investigations.  In addition, I have received training in financial analysis and identification of fraudulent financial activity both in Quantico and elsewhere.  During the time I have been employed by the FBI, I have participated in investigations relating to criminal investigative matters, including health care fraud, and have spoken to and learned from other agents who are experienced in investigating health care fraud schemes.  I have participated in many aspects of criminal investigations, including reviewing

evidence, conducting physical surveillance, interviewing witnesses, and the execution of search and arrest warrants.

2. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other agents, witnesses, and documents. In preparing this affidavit, I conferred with other FBI agents and agents of the Department of Health and Human Services-Office of Investigations ("HHS-OIG") who regularly investigate health care fraud and are assisting the FBI in conducting this investigation. This affidavit is intended to show merely that there is sufficient probable cause to support an arrest and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. PURPOSE OF AFFIDAVIT

3. Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that LOURDES NAVARRO ("NAVARRO") has made false statements and concealed material facts, in violation of Title 18, United States Code, Section 1001.

4. Specifically, this investigation revealed that NAVARRO made false statements to HHS-OIG in connection with her application for reinstatement of Medicare billing privileges,

after being excluded for being convicted of a prior health care fraud offense. NAVARRO falsely stated that during the period of her exclusion, she had not had owned or operated a health care entity, or served as a manager, administrator, or director of any entity that furnished health care items of services, when in fact she had held such positions in Matias Clinical Laboratory, Inc., d/b/a Health Care Providers Lab ("Matias"), a clinical laboratory located in the Central District of California that provided health care services.

5. During the time period that NAVARRO owned and/or controlled Matias, Matias submitted approximately $214 million in claims to Medicare for clinical laboratory testing, including testing conducted during the COVID-19 pandemic for lucrative, respiratory pathogen tests that did not test for COVID-19.

    **A.** **Exclusion from Medicare and Medicare Enrollment**

6. Medicare was a federally funded health insurance program that provided benefits to individuals who were 65 years and older, and to certain disabled persons. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under HHS. Medicare was a "health care benefit program," as defined in Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

7.      Under Title 42, United States Code, Section 1320a-7(a), HHS was required to exclude an individual from participation ("mandatory exclusion") in any Federal health care program if the individual was convicted of, among others, a criminal offense related to the delivery of an item or service under the Medicare program or under any state health care program (defined as including Medicaid and other health care programs and plans), or a criminal offense under Federal or state law, in connection with the delivery of a health care item or service or with respect to certain acts or omissions in a health care program operated by or financed by any federal or state agency, where the offense was a felony relating to fraud, theft, embezzlement, or related crimes.  HHS also had discretionary authority ("permissive exclusion") Title 42, United States Code, Section 1320a-7(b) to exclude individuals who had been convicted of other crimes, who had been excluded or suspended under other federal programs, or who had engaged in other false conduct, among other things.

8.      Under Title 42, United States Code, Section 1320a-7(g), an excluded individual could, at the end of the period of exclusion, apply to HHS for termination of exclusion (also known as reinstatement).  HHS had authority to terminate the exclusion if it determined, on the basis of the conduct of the applicant after the date of the notice of exclusion, that there was no

4

basis to continue the exclusion due to conduct that could lead to mandatory or permissive exclusion in the first place, and that there were assurances that the types of actions that had formed the basis for the exclusion had not and would not recur.

    **B.**    **Exclusion of NAVARRO from Medicare**

    9.    On or about September 30, 2002, HHS-OIG issued a letter to NAVARRO notifying her that she was "being excluded from all participation in any capacity in the Medicare, Medicaid, and **all** Federal health care programs" (emphasis in original) for a minimum period of 15 years. The letter stated that the action was taken under Title 42, United States Code, Section 1320a-7(a) and would be effective 20 days from the date of the letter. The letter explained that the exclusion was due to NAVARRO's convictions in the Superior Court of the State of California, County of Orange, of criminal offenses related to the delivery of items or services under the Medi-Cal program, as well as criminal offenses related to the delivery of items and services under the Medicare program. This investigation has revealed that NAVARRO was convicted in connection with a scheme to defraud the California Medicaid program by submitting claims for laboratory testing services that were not provided and medically unnecessary.

    10.    The letter further advised that reinstatement was not automatic, and required an application to the OIG and a decision

by OIG to grant reinstatement.  An attachment to the letter stated that "this exclusion is global, regardless of your job or location."

### III.  STATEMENT OF PROBABLE CAUSE

11.  This investigation has revealed that, in the Central District of California, and elsewhere, NAVARRO made false statements in connection with the submission of a letter to HHS-OIG, an executive branch agency, requesting reinstatement to Medicare.

12.  Probable cause is supported by, among other things, documentary evidence, statements from witnesses, documents obtained from Medicare, and financial records.

**A.    Documents Submitted to HHS-OIG**

13.  According to documents provided to me by HHS-OIG, on or about September 27, 2018, 16 years after NAVARRO had been excluded from Medicare, NAVARRO, indicating an address in the Central District of California, submitted a letter to HHS-OIG requesting reinstatement.  HHS-OIG responded in a letter to NAVARRO dated October 1, 2018, and addressed to an address in the Central District of California, stating that in order to apply for reinstatement, she was required to respond to each question in an Application for Reinstatement and provide her entire work history since the effective date of the exclusion (including "all health care employment").  The letter advised

that until reinstatement, she could not participate, "in any capacity, in the Medicare, Medicaid, or any Federal health care programs" until HHS-OIG provided written notice of reinstatement.

14. On or about November 6, 2018, NAVARRO signed under penalty of perjury, and had notarized, an HHS-OIG form entitled Application for Reinstatement to Federal Health Care Program Participation (the "Application"). The signature on the Application matches other signatures of NAVARRO that I have observed on banking records for bank accounts owned or controlled by LOURDES NAVARRO. The address for NAVARRO provided on the form is the same address in the Central District of California as on her previous letter to HHS-OIG. The notary stamp shows that it was attested to by a Notary Public who was located in the Central District of California in Los Angeles County.

15. Based on information provided by HHS-OIG, this document was transmitted to HHS-OIG. The Application contains instructions on the first page. The Instructions state that the respondent must respond "yes," "no," or "NA" in a box next to each question, and must provide details where applicable. The Application states that any "misrepresentation or omission of a material fact in this application" may subject the applicant to "criminal prosecution under 18 U.S.C. 1001."

7

16. Question 8 on the Application asked the following: "During your period of exclusion did you own any health care related entity, operate any health care related entity, or serve as a manager, administrator, or director of any entity that furnished health care services?" In the box to the right of the question, LOURDES NAVARRO stated "**NO.**"

17. Item 16 on the Application stated: "Please list **any and all** employment (health care, non-health care, part-time, self-employment, etc.) . . . " (emphasis in original). The Application contains, in handwriting that I recognize as NAVARRO's, descriptions of employment between August 2001 and December 2012. It then states "2013 – onwards Housewife."

18. Based on evidence developed in this investigation, described below, NAVARRO's answer of "**No**" to the question whether she had owned or operated any health care entity, or had served as a manager, administrator, or director of any entity that furnished health care items or services, was a knowingly false statement in violation of Title 18, United States Code, Section 1001.

19. Based on these materially false statements, NAVARRO was reinstated by HHS. HHS-OIG sent a letter, dated December 14, 2018, and addressed to NAVARRO in the Central District of California, approving her request for reinstatement.

### B.     Statements from Witnesses

20. Numerous employees of Matias confirmed to federal agents that NAVARRO owned and operated Matias prior to the reinstatement application.

21. For example, agents interviewed Employee 1, who worked at Matias as a clinical laboratory scientist from approximately 1995 to the latter half of 2018. Employee 1 stated that in 2016 or 2017 (prior to NAVARRO seeking reinstatement), the prior owner of Matias introduced employees to a husband and wife as the new owners. After this introduction, NAVARRO, who introduced herself as "Lulu," assumed an ownership role over the company. Employee 1's description of "Lulu" matches that of NAVARRO, based on a photograph I have reviewed. As described below, other witnesses interviewed in this investigation described knowing the wife of a husband-wife team that owned and controlled Matias as "Lulu." The email address below NAVARRO's signature block on her September 2018 letter to HHS-OIG inquiring about reinstatement also contains the phrase "Lulu" in the address: upilulu@aol.com.

22. According to evidence gathered in this investigation, NAVARRO has been married since 2016 to Person A, who matches the description of the husband who Employee 1 stated became one of the new owners of Matias in 2016 or 2017. Furthermore, Person A has been identified by multiple witnesses as having had a

9

leadership role in Matias dating to before the reinstatement application was submitted in November 2018 and was identified on Matias's banking records as an officer on November 9, 2015, years before the reinstatement application was submitted in November 2018.

23. Employee 1 stated that when NAVARRO was present at the lab, she and Person A exercised the power and responsibility of the owners of the company, including scheduling and managing meetings with the employees, taking care of payroll, meeting with vendors, and talking about the future business direction of the lab.

24. Agents also interviewed Cooperator A, a cooperating witness who operated a medical marketing company and who has pled guilty and entered into a cooperation agreement with the United States. Cooperator A stated that in approximately July 2018, he/she was introduced to a husband and wife by the name of "Lulu," who, Cooperator A had been told, ran Matias (known to Cooperator A as Health Care Providers Lab) and were amenable to relationships with new marketers. According to Cooperator A, "Lulu" and Person A stated that they ran Matias and offered a contract on behalf of Matias. The parties entered into a relationship which lasted approximately 16 months, during which time Cooperator A met, spoke on the phone, and emailed with "Lulu" at the upilulu@aol.com email address multiple times,

10

including in October 2018 (prior to NAVARRO seeking reinstatement) to discuss various business matters relating to the provision of specimens to Matias.  This included "Lulu" making specific requests for types of specimens that would receive a higher Medicare reimbursement.  Medicare claims data I have reviewed corroborates that Matias billed for the types of tests "Lulu" requested of Cooperator A.  Cooperator A identified the wife as "Lulu", although Cooperator A did not make a positive identification of NAVARRO when shown a photo from approximately the early 2000's.

25.  Agents interviewed other witnesses who interacted with NAVARRO at Matias after she obtained reinstatement based on the false statements described above, and these witnesses corroborated Employee 1 and Cooperator 1 in regard to NAVARRO's use of the name "Lulu."  These witnesses also gave descriptions of NAVARRO's role at Matias that is consistent with the witnesses who interacted with her before she signed the Application.

26.  For example, Employee 2, a phlebotomist who worked at Matias in 2021, stated that a person known as "Lulu" was the clinical laboratory scientist in charge of the lab at Matias[1],

---

[1] Records from the California Department of Public Health show that NAVARRO applied for and received a certification as a clinical lab scientist from the State of California during the period of her exclusion.

11

and Person A was the CEO.  Employee 2's description of "Lulu" matches that of NAVARRO.

27.  Employee 3, who worked at Matias as a biller in 2020 and 2021, stated that he/she understood an individual known as "Lulu" was one of the owners or managers.  "Lulu" conducted the job interview that resulted in Employee 3 being hired, supervised, and directed the work of other employees, including the manager of the billing department where Employee 3 worked, and regularly behaved as though she were in charge.

    C.    **Documents Submitted to Medicare and Other Regulators**

28.  In connection with this investigation, I also have reviewed documents other documents obtained from Medicare regarding Matias, which further establish that NAVARRO intentionally sought to conceal and disguise her role with Matias.  In none of the submissions to Medicare was NAVARRO's ownership and/or control of Matias disclosed to Medicare, as required by Medicare within 90 days of obtaining ownership and/or managing control.

29.  I also have reviewed documents from the California Department of Public Health.  From 2016-2020, Matias filed multiple renewal applications and notifications of changes in ownership with the California Department of Public Health, the accreditation agency for California laboratories.  But NAVARRO's

ownership and management/control is not listed anywhere in these filings.

### D. Financial Records

30. I also have examined financial records in connection with this investigation, which together with an analysis of the transfers of funds, show that NAVARRO owned and/or controlled Matias. Financial records indicate that, between May 2019 and November 2021, NAVARRO caused the transfer of funds from Matias's business account at East West Bank of approximately $5.9 million to Company A, a company owned by NAVARRO, and approximately $2.1 million to Company B, a company owned by NAVARRO. In both instances, the money went into bank accounts on which NAVARRO was the sole signer. In examining the financial records of Company A and Company B, it does not appear that these companies conduct any legitimate business operations.

### IV. CONCLUSION

31. For all the reasons described above, I submit there is probable cause to believe that LOURDES NAVARRO has committed a violation of Title 18, United States Code, Section 1001.

/s/
Special Agent Elaine Wong
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this <u>7th</u> day of April, 2022.

_John E. McDermott_
_____
HONORABLE JOHN E. MCDERMOTT
UNITED STATES MAGISTRATE JUDGE